IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ARTHUR MUNGER, | ) | CASE NO.  1:24-CV-01019-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Arthur Munger ("Plaintiff" or "Munger"), challenges the final decision of Defendant, Leland Dudek,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In May 2022, Munger filed applications for POD, DIB, and SSI, alleging a disability onset date of August 6, 2020 and claiming he was disabled due to a learning disability, severe anxiety, severe depression, left chest wall pain, severe asthma, inability to lift and carry, and high blood pressure.  (Transcript ("Tr.") at 313, 359.)  The applications were denied initially and upon reconsideration, and Munger requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 359.)

---

[1] On February 19, 2025, Leland Dudek became the Acting Commissioner of Social Security.

On June 13, 2023, an ALJ held a hearing, during which Munger, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On August 2, 2023, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 359-78.)  The ALJ's decision became final on April 23, 2024, when the Appeals Council declined further review.  (*Id.* at 38-44.)

On June 18, 2024, Munger filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 11.)  Munger asserts the following assignments of error:

(1) The Administrative Law Judge committed reversible error by failing to include all of Plaintiff's limitations in the residual functional capacity assessment.

(2) The Administrative Law Judge erred in her analysis of Listing 12.07 by failing to include the Plaintiff's somatic symptoms.

(3) Whether evidence submitted subsequent to the hearing is new and material evidence warranting remand.

(Doc. No. 9.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Munger was born in August 1990 and was 32 years old at the time of his administrative hearing (Tr. 359, 376), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  He has at least a high school education.  (Tr. 376.)  He has past relevant work as a rural mail carrier, forklift operator, press operator, production maintenance, and building maintenance laborer.  (*Id.* at 375.)

### B.    Relevant Medical Evidence[2]

On July 1, 2021, Munger saw Glenn Beck, D.O., for medication management and reported overall

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

he was doing well.  (*Id.* at 623.)  Munger told Dr. Beck he had intermittent chest pain that was an "annoyance" and that he wanted to undergo physical therapy.  (*Id.*)  On examination, Dr. Beck found left-sided tenderness along the anterior axillary line of the lower ribs.  (*Id.* at 624.)  Dr. Beck referred Munger to physical therapy for his chest wall pain and noted Munger had seen pain management in the past without much improvement.  (*Id.* at 625.)

On February 9, 2022, Munger saw Michael Jones, PT, for a physical therapy evaluation.  (*Id.* at 614.)  Munger reported left-sided chest pain for the past three years that had started after lifting fifty-pound drums at a previous job.  (*Id.*)  Munger told Jones he had problems with lifting.  (*Id.*)  Munger endorsed a burning sensation down his left arm at times and pain in his chest with eating, lifting, and prolonged stationary activities.  (*Id.*)  Munger denied numbness and tingling, grip weakness, and pain with deep breaths in or out.  (*Id.*)  Munger rated his pain as a 3-4/10 on average, but it could quickly reach a 10/10.  (*Id.*)  Munger rated his pain that day as a 7/10.  (*Id.*)  On examination, Jones found painful and limited thoracic flexion, mild restriction of thoracic extension with discomfort, mild restriction of side bend motions, intact upper quarter strength bilaterally, painful rib springing at T8 and T9, and increased paraspinal bulk in the thoracic spine on the right.  (*Id.* at 615.)  Jones opined that Munger presented with "functionally limiting left upper quarter chest pain that appears to have mechanical signs for potential thoracic/rib dysfunction potential."  (*Id.*)  Munger's problems included decreased range of motion, decreased flexibility, decreased transfers/transitions, pain, abnormal tone/quality of movement, poor understanding of management of deficits, and postural deficit.  (*Id.* at 615-16.)

On February 17, 2022, Munger saw Glenn Beck, D.O., for follow up.  (*Id.* at 609.)  Munger reported continued costochondral chest pain that had not improved with physical therapy, although Dr. Beck noted Munger had only been seeing the physical therapist for a week.  (*Id.*)  Munger reported good motivation and self-esteem.  (*Id.*)  Dr. Beck noted Munger was "nervous/anxious."  (*Id.* at 612.)  On examination, Dr. Beck

found chest wall tenderness and possible pain in the costochondral junction in the lower ribs on the left. (*Id*.)
Dr. Beck directed Munger to continue physical therapy and prescribed Meloxicam. (*Id*. at 613.)

Munger saw Jones for additional physical therapy sessions on February 18, 2024, and February 24,
2024. (*Id.* at 606-08.)

On May 2, 2022, Munger saw Feras Hamdan, M.D., to establish care. (*Id.* at 601.) Munger reported
chronic left-side rib pain that flared up when he ate, walked, and sat. (*Id.*) Munger told Dr. Hamdan the
pain prevented him from working and sleeping. (*Id.* at 601-02.) Munger described the pain as stabbing and
sharp, and it was worse with breathing and exertional movements. (*Id.* at 602.) Munger reported taking
Meloxicam with minimal relief. (*Id.*) On examination, Dr. Hamdan found tenderness and normal range of
motion. (*Id.* at 604.) Dr. Hamdan prescribed a Medrol Dose Pack and ordered a chest CT. (*Id.* at 605.)

A chest CT scan taken on May 24, 2022 revealed no acute abnormality. (*Id.* at 670.)

On June 2, 2022, Munger saw Dr. Hamdan for follow up. (*Id.* at 592.) Munger reported his left-
sided rib pain continued to be severe. (*Id.*) Munger's father, who had accompanied him to the appointment,
told Dr. Hamdan that Munger was "very anxious, sometimes even leading into outbreaks," and Munger was
"constantly stressing or anxious over little matters and turning into 'big deals.'" (*Id.* at 593.) On
examination, Dr. Hamdan found no physical findings. (*Id.* at 594.) Dr. Hamdan explained that all work
ups had been within normal limits and discussed the possibility of an underlying psychological component
with Munger. (*Id.*) Dr. Hamdan increased Lexapro, prescribed hydroxyzine for acute panic attacks, and
encouraged cognitive behavioral therapy. (*Id.*)

On June 13, 2022, Munger underwent a pre-admission diagnostic evaluation with Daisy Roblandza,
LSW. (*Id.* at 694.) Munger reported anxiety attacks, severe anxiety, and side pain that his doctor felt was
anxiety related. (*Id.*) Munger told Roblandza he had experienced "extreme anxiety since childhood." (*Id.*)
On examination, Roblandza found a friendly demeanor, good eye contact, normal speech, logical thought

process, euthymic affect, fair mood, nervousness, cooperative behavior, below average intelligence, and cognition issues.  (*Id.* at 697.)  Munger's diagnoses consisted of panic disorder, social anxiety disorder, recurrent major depressive disorder, severe, and circadian rhythm sleep-wake disorder, irregular sleep-wake type. (*Id.* at 698-99.)

On June 25, 2022, Munger went to the emergency room for his left-sided rib pain.  (*Id.* at 751.) Munger reported he had had this pain off and on for four years, it had not changed, and his symptoms were normal for him over the past four years.  (*Id.* at 752.)  Munger described the pain as dull and intermittent. (*Id.*)  He reported he had seen specialists for this problem, and they all said it was anxiety.  (*Id.*)  On examination, treatment providers found no mass, lacerations, deformity, swelling, tenderness, crepitus, or edema of the chest wall.  (*Id.* at 754.)  Treatment providers further found flat affect, delayed speech, cooperative behavior, normal cognition and memory, and normal judgment.  (*Id.*)  After ordering basic blood work and x-rays of the ribs, treatment providers prescribed Naproxen and discharged Munger in stable and improved condition.  (*Id.* at 755.)

On June 29, 2022, Munger saw Kathleen E. Shontz, APRN, CNP, for follow up after his emergency visit. (*Id.* at 749.)  Munger reported he did not think increased Lexapro and Atarax was helpful and did not think his symptoms were related to anxiety.  (*Id.*)  He was willing to try a new medication.  (*Id.*)  Munger described his rib pain as "'unbearable'" and endorsed nausea, shaking, and weakness for the past few days. (*Id.*)  Munger told Shontz he had "even 'lost his eyesight after an episode.'"  (*Id.*)  He could not do any heavy lifting, pushing, or pulling, as it exacerbated his pain.  (*Id.*)  Shontz found no positive physical findings on examination.  (*Id.* at 750-51.)  Shontz referred Munger to pain management and noted "consider switching to another SSRI/SNRI."  (*Id.* at 751.)

On June 29, 2022, Munger underwent a Mental Health Physicians Assessment.  (*Id.* at 701.)  Munger reported panic attacks, increased anxiety, palpitations, and shortness of breath.  (*Id.*)  Munger also endorsed

somatic symptoms. (*Id.*) Munger stated benzos had helped in the past. (*Id.*) He was taking hydroxyzine with no benefit. (*Id.*) Munger also endorsed sleep problems. (*Id.*) On examination, Premal Patwa, M.D., found cooperative behavior, euthymic affect, linear and goal-directed thought process, and fair judgment and insight. (*Id.* at 702, 704.) Dr. Patwa's diagnostic impression consisted of social anxiety disorder, rule out generalized anxiety disorder, major depressive disorder, recurrent, mild, nerve pain, and rule out panic disorder, rule out somatization. (*Id.* at 702.) Dr. Patwa continued Lexapro and started Munger on Seroquel XR to help with his somatic symptoms. (*Id.*)

On July 5, 2022, Munger saw Dr. Hamdan for follow up. (*Id.* at 746.) Munger reported continued anxiety and left-sided rib pain. (*Id.* at 747.) Munger told Dr. Hamdan he was seeing pain management the next day and starting therapy the following week. (*Id.*) While Munger stated the pain that sent him to the emergency room had resolved, his anxiety was not getting better, even though he was "taking [L]exapro daily [and] [A]tarax constantly." (*Id.*) Dr. Hamdan continued Munger's SSRI and started him on hydroxyzine. (*Id.* at 748.)

On July 13, 2022, Munger saw Theodore Eckman, M.D., for a pain management new patient evaluation. (*Id.* at 742.) Munger described his pain as located on the left side of his chest and upper abdomen and rated it as a 6/10 on average and an 8/10 with activity. (*Id.*) He rated his pain as a 6/10 that day. (*Id.*) Munger further described the pain as sharp, burning, throbbing, stabbing, and spasming. (*Id.*) Sitting, lifting/bending, standing, walking, lying down, and changing positions exacerbated his pain, while pain medication alleviated it. (*Id.*) On examination, Dr. Eckman found tenderness to palpation of the left-sided rib along the anterior-medial compartment, ribs T8 and T9, no swelling, and normal range of motion. (*Id.* at 745.) Munger's diagnoses included intercostal neuralgia, neuropathic pain, anxiety, and depression. (*Id.*) Dr. Eckman discussed nerve blocks at T8 and T9, which Munger said he would consider. (*Id.* at 746.)

6

Dr. Eckman started Munger on Lyrica and encouraged Munger to continue to follow up with psychology regarding his anxiety and depression.  (*Id.* at 745-46.)

On July 21, 2022, Munger saw Dr. Eckman for follow up.  (*Id.* at 734.)  Munger reported no meaningful decrease in pain with Lyrica.  (*Id.*)  On examination, Dr. Eckman found tenderness to palpation of the left-sided rib along the anterior-medial compartment, ribs T8 and T9, no swelling, and normal range of motion.  (*Id.* at 737.)  Dr. Eckman further found 4/5 handgrip strength on the left.  (*Id.*)  Dr. Eckman again discussed nerve blocks at T8 and T9, which Munger said he would consider.  (*Id.* at 738.)  In the meantime, Dr. Eckman increased Lyrica to three times daily.  (*Id.*)

On July 25, 2022, Munger saw Tiffany Young, LPC, for counseling.  (*Id.* at 785, 787.)  On examination, Young found no significant change in Munger's mood, affect, thought process, orientation, behavior, or functioning since his last appointment.  (*Id.* at 785.)  Young determined Munger had made some progress since his last appointment.  (*Id.* at 786.)

On August 8, 2022, Munger saw Young for counseling.  (*Id.* at 788.)  Munger reported he had struggled with physical pain the past few days.  (*Id.* at 789.)  On examination, Young found no significant change in Munger's mood, affect, thought process, orientation, behavior, or functioning since his last appointment.  (*Id.* at 788.)  Young determined Munger had made some progress since his last appointment. (*Id.* at 790.)

On August 15, 2022, Munger saw Dr. Eckman for follow up.  (*Id.* at 727.)  Munger reported no meaningful decrease in pain on Lyrica 50mg.  (*Id.*)  On examination, Dr. Eckman found tenderness to palpation of the left-sided rib along the anterior-medial compartment, ribs T8 and T9, no swelling, and normal range of motion.  (*Id.* at 729.)  Dr. Eckman further found 4/5 handgrip strength on the left.  (*Id.* at 730.)  Munger's diagnoses included intercostal neuralgia, left hand weakness, cervical radiculopathy,

neuropathic pain, myofascial pain, anxiety, and depression.  (*Id.*)  Dr. Eckman increased Lyrica and ordered a cervical MRI.  (*Id.* at 730-31.)

On August 17, 2022, Munger saw Ronald Yendrek, D.O., for follow up regarding his depression, anxiety, and trouble sleeping.  (*Id.* at 782, 784.)  Munger reported he had taken hydroxyzine and Ativan, neither of which helped.  (*Id.* at 782.)  Munger described his mood as "give or take."  (*Id.*)  On examination, Dr. Yendrek found cooperative behavior, good eye contact, full orientation, normal speech, coherent articulation, a down affect, linear and goal-directed thought process, and fair judgment and insight.  (*Id.* at 783.)  Dr. Yendrek's diagnostic impression consisted of social anxiety disorder, rule out generalized anxiety disorder, and major depressive disorder, recurrent, mild.  (*Id.*)  Dr. Yendrek wanted genetic testing conducted before Munger's medications were changed.  (*Id.*)

On September 7, 2022, Munger went to the emergency room with complaints of worsening left side/abdominal pain which Munger described as sharp, aching, and constant with waxing and waning intensity.  (*Id.* at 722.)  Munger rated his pain as an 8/10, although most of the time it was a 10/10.  (*Id.*)  Munger reported the pain was worse with palpation, movement, eating, and deep breathing.  (*Id.*)  On examination, treatment providers found abdominal tenderness in the upper left quadrant.  (*Id.* at 724.)  Treatment providers administered pain medication and directed Munger to follow up with his primary care physician later that day as scheduled.  (*Id.*)

Later that day, Munger saw Dr. Hamdan.  (*Id.* at 720.)  Munger reported he had been given morphine in the emergency room, which relieved his pain.  (*Id.*)  Munger told Dr. Hamdan he was getting minimal relief with Lyrica 100 mg.  (*Id.*)  On examination, Dr. Hamdan found Munger was "in distress," although his physical exam was unremarkable.  (*Id.* at 721.)  Dr. Hamdan noted he was concerned for neuralgia.  (*Id.*)  Dr. Hamdan increased Lyrica.  (*Id.*)

An MRI of the cervical spine taken on September 9, 2022, revealed degenerative changes most severe at C4-C5.  (*Id.* at 764-68.)

On September 19, 2022, Munger saw Young for counseling.  (*Id.* at 791.)  On examination, Young found no significant change in Munger's mood, affect, thought process, orientation, behavior, or functioning since his last appointment.  (*Id.*)  Young determined Munger had made some progress since his last appointment.  (*Id.* at 793.)

On September 22, 2022, Munger saw Dr. Eckman for follow up and reported no meaningful decrease in pain with increased Lyrica.  (*Id.* at 802.)  On examination, Dr. Eckman found tenderness to palpation of the left-sided rib along the anterior-medial compartment, ribs T8 and T9, no swelling, and normal range of motion.  (*Id.* at 805.)  Dr. Eckman further found 4/5 handgrip strength on the left.  (*Id.*)  Dr. Eckman reported:

> He had on multiple occassions [sic] deferred injections that would serve both diagnostic and therapeutic value. Moreover, he may be experiencing cervical radiculopathy as well. A cervical MRI was largely normal although he does have a disk-osteophyte complex at C4/5 with mild ventral cord abutment; however, this would not explain his non-dermatomal pain affecting his whole hand. I reviewed treatment options with him in detail. He has elected to obtain a second opinion at CCF main campus, and this referral order has been placed. In the meantime, he is encouraged to continue Lyrica which was recently increased by his PCP to 200mg po tid.
>
> He strongly is encouraged to continue to follow-up with psychology for his anxiety and depression as undertreated psychiatric conditions will likely contribute to worsening pain experience. To this point, his pain may have a psychogenic component to it, and future referral to the CPRP program at CCF will be considered as well.
>
> He is encouraged to stay active as tolerated.

(*Id.* at 806.)

On October 19, 2022, Munger saw Dr. Yendrek for follow up.  (*Id.* at 963.)  Munger reported poor sleep because of pain and bad anxiety, mostly while driving.  (*Id.*)  Munger described his mood as "alright." (*Id.*)  On examination, Dr. Yendrek found cooperative behavior, good eye contact, full orientation, normal speech, coherent articulation, a down affect, linear and goal-directed thought process, and fair judgment and

insight.  (*Id.*)  Dr. Yendrek advised Munger to continue counseling and see a surgeon as soon as possible. (*Id.*)  Dr. Yendrek's diagnostic impression consisted of social anxiety disorder, rule out generalized anxiety disorder, and major depressive disorder, recurrent, mild.  (*Id.* at 964.)

On October 31, 2022, Munger saw Dr. Hamdan for follow up.  (*Id.* at 924.)  Munger reported he was supposed to receive an injection in his ribs on the left, but when he transferred to Cleveland Clinic pain management, Dr. Eckman retracted the injection.  (*Id.*)  Munger endorsed continued pain despite increased Lyrica.  (*Id.*)  Dr. Hamdan noted that Munger was "very anxious."  (*Id.* at 925.)  Munger's diagnoses consisted of mood disorder, conversion disorder, and intercostal neuralgia.  (*Id.*)  Dr. Hamdan noted Munger's work ups had been unremarkable and he was following with pain management for his neuralgia. (*Id.*)  Munger agreed to continue Lyrica.  (*Id.*)  Dr. Hamdan directed Munger to wean off his SSRI and start nortriptyline for mood and neuralgia.  (*Id.*)

On November 16, 2022, Munger went to the emergency room complaining of worsening left-side pain that he rated as a 9/10 and described as sharp, aching, burning, and intermittent.  (*Id.* at 921.)  Nothing alleviated the pain.  (*Id.*)  On examination, Orlando Cortez Jr., M.D., found abdominal tenderness in the left upper quadrant and an anxious mood.  (*Id.* at 922-23.)  Dr. Cortez Jr. diagnosed chronic abdominal pain, administered pain and anxiety medications, and discharged Munger in stable condition.  (*Id.* at 923.)

On November 22, 2022, Munger saw Dr. Hamdan for follow up after his emergency room visit.  (*Id.* at 917.)  Munger reported being given pain medication, dicyclomine for abdominal pain, and Alprazolam for his anxiety.  (*Id.*)  Munger told Dr. Hamdan the Alprazolam had been "very effective" for his anxiety. (*Id.*)  Dr. Hamdan noted Munger was "very anxious."  (*Id.* at 918.)  Dr. Hamdan prescribed a "transitional amount" of benzos until Munger's psychiatric follow up appointment.  (*Id.* at 919.)

On November 30, 2022, Munger saw Dr. Yendrek for follow up.  (*Id.* at 965.)  Munger reported having a good holiday with his children and girlfriend, although his sleep had been variable, he had been

getting antsy, and he had been in the emergency room four to five days ago because of left-sided pain.  (*Id.*) Munger told Dr. Yendrek he had received morphine and Xanax from the emergency room.  (*Id.*)  Munger described his mood as "decent," although it fluctuated with his pain, and his stress level was "OK" that day. (*Id.*)  On examination, Dr. Yendrek found good behavior, normal speech, good eye contact, reactive affect, normal thought process, fair memory, fair insight and judgment, good impulse control, and normal associations.  (*Id.* at 965-66.)  Dr. Yendrek renewed Munger's medications and advised Munger to continue counseling and see his medical doctor.  (*Id.* at 966.)

On January 13, 2023, Munger saw Nurse Shontz for follow up.  (*Id.* at 912.)  Munger reported he felt that his pain was "fairly well controlled" on his current medication regimen.  (*Id.*)  Munger told Nurse Shontz he was frustrated with the lack of coordination in his medical care and was not looking forward to establishing care with a new primary care physician, although he understood his chronic health conditions necessitated it.  (*Id.*)  Nurse Shontz noted Munger wanted to discuss disability, but she told Munger this would be more appropriate to discuss with his new primary care physician.  (*Id.*)  On examination, Nurse Shontz found tenderness to palpation on the ribs on the left along the anterior medial compartment, ribs T8 and T9, no swelling, and normal range of motion.  (*Id.* at 913.)  Munger's diagnoses consisted of intercostal neuralgia, chronic abdominal pain, low HDL, GERD without esophagitis, primary hypertension, and mood disorder.  (*Id.* at 914.)

On February 23, 2023, Munger saw Lindsey Mellott, D.O., to establish care as his new primary care physician.  (*Id.* at 906-07.)  Munger reported "good control" of his pain with 200mg of Lyrica three times a day.  (*Id.* at 907.)  Munger stated he had been referred to pain management in Cleveland, but he still needed to make an appointment.  (*Id.*)  Dr. Mellott noted Munger was not nervous/anxious.  (*Id.* at 908.)  On examination, Dr. Mellott found tenderness of the left side of the ribs and normal range of motion.  (*Id.* at 909.)  Munger's diagnoses consisted of GERD without esophagitis, intercostal neuralgia, primary

hypertension, and mood disorder.  (*Id.* at 910.)  Dr. Mellott continued Lyrica, but recommended Munger follow up with pain management in Cleveland.  (*Id.*)

On March 1, 2023, Munger saw Dr. Yendrek for follow up.  (*Id.* at 968.)  Munger reported he still had pain, but it was tolerable, and Lyrica was helping.  (*Id.*)  Munger endorsed "OK" sleep, a fluctuating mood that was better some days than others, and moderate anxiety.  (*Id.*)  On examination, Dr. Yendrek found normal attention, good behavior, normal speech, good eye contact, reactive affect, normal thought, fair judgment and insight, and normal associations.  (*Id.* at 968-69.)  Dr. Yendrek continued Munger's medications.  (*Id.* at 969.)

On March 24, 2023, Munger saw Dr. Mellott for follow up and reported continued left-sided pain in his rib cage.  (*Id.* at 942.)  He still had not made an appointment with pain management in Cleveland.  (*Id.*)  Dr. Mellott diagnosed Munger with costochondritis, gave Munger a handicap placard, and printed out a referral for pain management.  (*Id.* at 943.)

On March 29, 2023, Munger saw Dr. J. Cheng for a second opinion of his rib pain, which had spread down to his lower extremities and sometimes in his upper extremities, although his worst pain continued to be his left lower chest.  (*Id.* at 946.)  Munger described his pain as burning, severe, and constant.  (*Id.*)  Walking and pressure, such as wearing tight pants or lying prone, exacerbated his pain.  (*Id.*)  Munger denied numbness or focal weakness.  (*Id.*)  Dr. Cheng noted Munger was not interested in nerve blocks or procedural interventions.  (*Id.*)  Munger reported his arms were the least severe of his pain complaints.  (*Id.*)  Munger told Dr. Cheng this was the best his pain had ever been controlled, but he continued to experience "significant functional deficits," including inability to work, lift his six-year-old child, and walk even short distances.  (*Id.*)  On examination, Dr. Cheng found no tenderness to palpation of the intercostal spaces or chest wall, normal joint range of motion, no atrophy, and no abnormalities in tone.  (*Id.* at 948.)  Dr. Cheng opined that Munger's pain was most consistent with fibromyalgia and prescribed a trial of duloxetine.  (*Id.*

at 949.)  Dr. Cheng also prescribed aqua therapy and referred Munger to pain psychology.  (*Id.*)  Munger's diagnoses consisted of intercostal neuralgia, cervical radiculopathy, neuropathic pain, and myofascial pain. (*Id.*)

On April 10, 2023, Munger saw Dr. Mellott for follow up of his test results.  (*Id.* at 1055.)  Munger reported continued chest wall pain and that a second opinion from a pain management doctor had resulted in the addition of Cymbalta to his medication regimen.  (*Id.*)  Munger also reported referrals to a fibromyalgia specialist and aqua therapy.  (*Id.*)  On examination, Dr. Mellott found tenderness of the left side ribs and normal range of motion.  (*Id.* at 1056.)

On April 11, 2023, Munger went to the emergency room with complaints of right-sided chest discomfort and pain with breathing.  (*Id.* at 1062.)  Munger reported starting Cymbalta two weeks before for neuropathic pain.  (*Id.*)  Urgent care sent him to the ER for additional evaluation after concern for a possible pulmonary embolism.  (*Id.*)  On examination, treatment providers found tachycardia, swelling, and tenderness, as well as some tenderness to palpation along the right side of the chest wall.  (*Id.* at 1064, 1067.) Treatment providers suspected his symptoms were caused by costochondritis and recommended continued use of NSAIDs to help with pain, along with heat and ice, and continued use of his prescribed medications. (*Id.* at 1067.)

On April 26, 2023, Munger saw Young for counseling and reported he had finally gotten a diagnosis and was receiving better medical care.  (*Id.* at 1008, 1010.)  Munger told Young his mood had improved as a result.  (*Id.* at 1010.)  On examination, Young found a euthymic mood, a full range of affect, clear speech, friendly demeanor, full orientation, and logical and organized thought process.  (*Id.* at 1008.)  Young noted Munger had made progress, although he "continues to show struggle with emotional stability around physical health stressors."  (*Id.* at 1010.)

13

On April 27, 2023, Munger had a pain management telephone evaluation with Allison Ferguson, APRN, CNP.  (*Id.* at 1025.)  Munger reported he had been in the hospital the week before for pain in his side and leg with breathing, and that treatment providers had diagnosed a flare of his costochondritis pain.  (*Id.*)  Munger told Ferguson he had never had pain in his arms and legs before.  (*Id.*)  Munger also reported numbness in his arms and legs when he woke up.  (*Id.*)  Ferguson told Munger she would discuss increasing Cymbalta to 60mg daily with Dr. Cheng.  (*Id.* at 1026.)

On May 18, 2023, Munger underwent a behavioral medicine evaluation by Dr. Jill Mushkat Conomy, Ph.D.  (*Id.* at 955.)  Munger reported pain in his left lower chest and numbness and tingling from his neck down his right arm.  (*Id.*)  Sometimes Munger felt like he was on fire.  (*Id.*)  Munger described his pain as aching, especially in his legs, and throbbing in his chest.  (*Id.*)  His pain was better controlled with his current medication regimen, although he still experienced flares.  (*Id.*)  Munger reported fewer emergency visits with his current medication regimen, although he had gone two weeks before with complaints of right arm and neck pain.  (*Id.*)  Prolonged sitting or heavy lifting, including having to change a tire, exacerbated his pain.  (*Id.*)  Dr. Mushkat Conomy noted Munger reported some memory problems, and there was "not much need for concentration in his life."  (*Id.* at 957.)  Munger endorsed anxiety, frustration, anxiety attacks, and occasional depression.  (*Id.*)  He enjoyed activities with his children, including going to Cedar Point with them.  (*Id.* at 958.)  He tried to pace himself by taking breaks.  (*Id.*)

On examination, Dr. Mushkat Conomy found Munger neatly groomed, friendly, pleasant, and cooperative.  (*Id.* at 957.)  Munger sat throughout the entire session.  (*Id.*)  Testing suggested moderate depression.  (*Id.* at 958.)  Dr. Mushkat Conomy thought Munger was "likely to have a pain disorder with related psychological factors, F45.42, in conjunction with his pain problems."  (*Id.*)  Dr. Mushkat Conomy recommended individual therapy focused on pain and stress management, relaxation skills, sleep strategies, and increased functional activity, including exercise, as well as anxiety management.  (*Id.* at 959.)

14

On June 8, 2023, Dr. Mellott completed a Medical Source Statement – Mental Capacity.  (*Id.* at 987-88.)  Dr. Mellott opined Munger had no mental limitations.  (*Id.*)  Dr. Mellott explained Munger "has issues with pain, not mental capacity.  He was able to hold a job until his pain occurred."  (*Id.* at 988.)

### 1.      Evidence Post-Dating the Hearing

On June 26, 2023, Munger had a chronic pain evaluation over the telephone with Nurse Ferguson.  (*Id.* at 248.)  Munger reported that since his last visit, his arms and legs occasionally went numb.  (*Id.*)  Munger told Ferguson he had talked to his primary care physician about it and "she placed an order to neurology."  (*Id.*)  Munger denied any issues with his current medications.  (*Id.* at 249.)

On July 12, 2023, Munger saw Dr. Mushkat Conomy for follow up.  (*Id.* at 210.)  Munger reported muscle spasms in his arms and legs, and his primary care physician had ordered an EMG.  (*Id.*)  Munger's diagnoses consisted of anxiety and depression, pain disorder with related psychological factors, and fibromyalgia.  (*Id.* at 211.)

On August 8, 2023, Munger saw Dr. Mushkat Conomy for follow up.  (*Id.* at 191.)  Munger reported waking up in the morning with his arms numb and heavy for the past three to four weeks, and he was seeing neurology for an EMG the following Monday.  (*Id.*)  During their session, Dr. Mushkat Conomy suggested Munger call his primary care physician about his new symptoms with his hands.  (*Id.* at 192.)

On August 18, 2023, Munger saw Dr. Mellott for follow up.  (*Id.* at 95.)  Dr. Mellott stated:

> Presents for follow-up. He states he has been doing well overall. He [is] still having some numbness and tingling in his hands. His legs are actually improved. He did get an EMG study which was within normal limits. His pain is improved. He is seeing multiple specialist and he states he has been able to stay out of the ED with the medication he is on currently. The numbness is mainly when he wakes up in the morning. It does go away throughout the day. He had an x-ray completed which was normal of his neck[.]

(*Id.*)  On examination, Dr. Mellott found negative Tinel's and Phalen's signs.  (*Id.* at 96.)  Munger's diagnoses included bilateral carpal tunnel syndrome.  (*Id.* at 97.)  Dr. Mellott noted that Munger "[l]ikely

does have carpal tunnel will try cock-up splints as he does not wish to complete another EMG at this point in time.  Continue all other medications as all current conditions are currently stable."  (*Id.* at 98.)

## C.  State Agency Reports

### 1.  Mental Impairments

On August 19, 2022, Courtney Zeune, Psy.D., reviewed the file and opined that Munger had moderate limitations in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 316, 325.)  Dr. Zeune further opined that Munger was "[l]imited to simple routine & predictable tasks in a static setting."  (*Id.* at 318, 327.)  Munger could perform goal-oriented work but could not work at a production rate pace.  (*Id.*)  Munger could interact with supervisors and the public if the interaction was limited to speaking and signaling.  (*Id.*)  Munger should have no interaction with the public.  (*Id.*)

On November 17, 2022, on reconsideration, Vicki Warren, Ph.D., affirmed Dr. Zeune's findings regarding the Paragraph B criteria.  (*Id.* at 334-35, 347-48.)  Dr. Warren opined that Munger could perform simple, routine, and repetitive type tasks.  (*Id.* at 339, 352.)  He could perform goal-oriented work but could not work at a production-rate pace.  (*Id.*)  Munger could interact with supervisors and the public if the interaction was limited to speaking and signaling.  (*Id.* at 339, 353.)  He should have no interaction with the public.  (*Id.*)  Munger was limited to simple, routine, and predictable tasks in a static setting.  (*Id.*)

### 2.  Physical Impairments

On August 26, 2022, Steve McKee, M.D., reviewed the file and opined that Munger could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds.  (*Id.* at 317-18, 326-27.)  His ability to push and/or pull in the upper and lower extremities was unlimited, other than shown for lift and/or carry.  (*Id.* at 317, 326.)  He could stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday.  (*Id.*)  Dr. McKee further opined

that Munger could frequently climb ramps/stairs and occasionally climb ladders, ropes, and scaffolds.  (*Id.*) He could frequently kneel, crouch, and crawl.  (*Id.*)  His ability to balance and stoop was unlimited.  (*Id.*) Munger must avoid concentrated exposure to extreme temperatures, humidity, and fumes, odors, dusts, gases, poor ventilation, etc.  (*Id.* at 318, 327.)

On November 16, 2022, on reconsideration, Elizabeth Das, M.D., reviewed the file and opined that Munger could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds.  (*Id.* at 336, 338, 349, 351.)  His ability to push and/or pull in the upper and lower extremities was unlimited, other than shown for lift and/or carry.  (*Id.* at 336, 350.)  He could stand and/or walk for a total of about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday.  (*Id.*)  Dr. Das further opined that Munger could occasionally climb ramps/stairs but never climb ladders, ropes, and scaffolds.  (*Id.* at 337, 350.)  He could occasionally stoop, crouch, and crawl.  (*Id.*)  His ability to balance and kneel was unlimited.  (*Id.*)  He could frequently handle on the left due to left-sided handgrip weakness. (*Id.*)  Munger must avoid concentrated exposure to extreme temperatures, humidity, and fumes, odors, dusts, gases, poor ventilation, etc.  (*Id.* at 338, 351.)

**D.    Hearing Testimony**

During the June 13, 2023 hearing, Munger testified to the following:

- He graduated high school.  (*Id.* at 268.)  He took special education classes in school. (*Id.*)  He has more trouble with writing than reading.  (*Id.* at 269.)  He misspells a lot of words.  (*Id.*)

- On a typical day, it takes him a while to get up because he must roll out of bed.  (*Id.*) He takes his pain medications, which hopefully relieves some of his pain.  (*Id.*)  He then tries to sit in his chair in the front room and he alternates sitting and standing. (*Id.*)  He cannot watch TV because he must alternate sitting and standing.  (*Id.*)  He takes more medications.  (*Id.*)  He may talk to his girlfriend on the phone, and she may bring his kids over to see him.  (*Id.*)  He takes naps during the day.  (*Id.* at 271.)

- He lives alone.  (*Id.* at 268.)  He holds a valid driver's license.  (*Id.*)  He does not cook or prepare meals for himself; his girlfriend brings him meals.  (*Id.* at 270.)  He does not do any chores around the house.  (*Id.*)  He did the dishes a few years ago, but he ended up having to buy a dishwasher because he was breaking so many dishes; his arm

went numb at times and he would break them. (*Id.*) He used to load the dishwasher, but he does not anymore. (*Id.*) His girlfriend usually comes over and loads the dishwasher for him. (*Id.*) He tries to do the shopping when he can. (*Id.* at 271.) He borrows his girlfriend's car. (*Id.*) He used to do grocery pickup at Walmart, but they were taking 40 minutes to an hour to bring out the groceries, and he would have to get in and out of the car constantly. (*Id.*) He started going into Walmart, but he had to get a handicap placard for the car because he would have to rest after walking from the car into the store, and he would be so exhausted he could hardly shop. (*Id.*) Sometimes he must use an electric cart and people give him "bad looks" because he is young. (*Id.* at 272.)

- He does not usually wear socks. (*Id.* at 270.) He just slips on shoes. (*Id.*) He wears stretch pants instead of "normal" pants. (*Id.*) He showers twice a week. (*Id.*)

- He cannot work because of his pain. (*Id.* at 278.) He always has pain, even on his medications. (*Id.*) His pain is always at a four or five, but it flares up at times. (*Id.*) The pain started on the left side of his chest but has moved to his lower legs and hands now. (*Id.*) His hands go numb now, which never happened before. (*Id.*) His legs also go numb. (*Id.*) He takes Pregabalin for the pain. (*Id.*) He has tried Cymbalta and other medications. (*Id.*) If his pain flares up, he takes anxiety medication to control the pain and keep him out of the ER as much as possible. (*Id.* at 279.) He tried physical therapy, but it did not work. (*Id.*) He is starting aqua therapy. (*Id.*) His doctors had talked about giving him injections in his rib cage, but the injections won't help with the fibromyalgia component. (*Id.*)

- He has three psychiatrists who call him to help him cope with his pain and his emotional breakdowns. (*Id.*) He always had anxiety and depression, but the pain changed his entire life. (*Id.* at 280.) He gets panic attacks once or twice a day. (*Id.* at 282.) His depression and anxiety magnify his pain, and his pain affects his anxiety and depression. (*Id.* at 287.)

- His medications cause drowsiness and sleepiness. (*Id.* at 283.) He gets confused a lot and forgets things. (*Id.*) He gets dizzy when he stands up or lays down. (*Id.*)

- He does not carry any weight. (*Id.*) He cannot lift anything. (*Id.*) He struggles to pick up a gallon of milk. (*Id.*) How long he can stand depends on his pain; sometimes it's fifteen minutes and sometimes it's five minutes. (*Id.*) When he walks, he must rest constantly. (*Id.*) He could walk from his house to the car before he needs to rest. (*Id.*) He can sit for five to fifteen minutes before needing to stand up. (*Id.* at 284.) He has difficulty holding onto things. (*Id.*) He can reach for things in front of him if he doesn't spill it, but he may drop it. (*Id.*) He cannot reach over his head. (*Id.*) He cannot go up and down stairs. (*Id.*) He cannot get down on both knees. (*Id.*) He cannot crawl. (*Id.* at 285.)

- He has a hard time being around large groups of people. (*Id.*) His anxiety takes over and he thinks people are judging him, so he doesn't go out. (*Id.*) He forgets day to day things. (*Id.*) Sometimes he forgets appointments. (*Id.*) He has trouble

18

concentrating or focusing on things.  (*Id.*)  If he tries to watch TV, his mind wanders and he loses track of things because of his pain.  (*Id.*)  If he tries to write something down and he starts hurting, he loses track of it.  (*Id.*)  If he is supposed to call someone, he loses track of that too.  (*Id.*)

The VE testified Munger had past work as a rural mail carrier, forklift operator, press operator, production maintenance, and building maintenance.  (*Id.* at 288-89.)  The ALJ then posed the following hypothetical question:

> Let's assume a hypothetical person of the same age, education, and employment background as Mr. Munger who is at the light exertional level. They could occasionally climb ramps and stairs, but no ladders, ropes, or scaffolding.  Occasional stoop, kneel, crouch, crawl.  Occasional reaching overhead.  Frequent handle.  This person would not be exposed to extreme cold or heat or humidity.  No concentrated exposure to pulmonary irritants such as fumes, dust, odors, gases, chemicals.  No unprotected heights or hazardous machinery.  This person would perform simple, routine tasks with simple, short instructions, make simple decisions with occasional workplace changes, but no strict production rate or hourly quotas. Occasional interaction with coworkers, supervisors, and the public, but no requirement to write reports or perform math calculations without tools.  So, the person can use a calculator or cash register.  The person can complete checklists, but they're just not writing extensive reports.  Would that hypothetical person be able to perform Mr. Munger's past work?

(*Id.* at 290.)

The VE testified the hypothetical individual would not be able to perform Munger's past work as a rural mail carrier, forklift operator, press operator, production maintenance, and building maintenance.  (*Id.*) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as mail clerk, garment sorter, and office helper.  (*Id.*)

The ALJ modified the hypothetical to limit the individual to no interaction with the public.  (*Id.*) The VE testified that limitation would not affect the jobs previously identified.  (*Id.* at 291.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

19

determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent

the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Munger was insured on the alleged disability onset date, August 6, 2020, and remains insured through March 31, 2025, the date last insured ("DLI").  (Tr. 359-60.)  Therefore, in order to be entitled to POD and DIB, Munger must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2025.

2.    The claimant has not engaged in substantial gainful activity since August 6, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: costochondritis and/or intercostal neuralgia, degenerative disc disease of the cervical spine with radiculopathy, asthma, obesity, panic disorder, social anxiety disorder, major depressive disorder, mood disorder, conversion disorder, and learning disability (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally climb ramps and stairs but no ladders, ropes, or scaffolding; occasional stoop, kneel, crouch, and crawl; occasional reaching overhead; frequent handle; would not be exposed to extreme cold, heat, or humidity, no concentrated exposure to pulmonary irritants, such as fumes, dusts, odors, gases, and chemicals, and no unprotected heights or hazardous machinery. The claimant can perform simple routine tasks with simple short instructions, make simple decisions with occasional workplace changes but no strict production rate or hourly quotas, occasional interaction with coworkers, supervisors but have no interaction with the public, and no requirement to write reports or perform math calculations without tools, so he can use a calculator or

21

cash register and can complete checklists but would not be writing extensive reports.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on August **, 1990 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 6, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 362-77.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by

22

substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

23

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Listing 12.07

In his second assignment of error, Munger argues that while the ALJ found Munger's "severe impairments included a conversion disorder," the ALJ failed to consider Munger's "somatic complaints, including his chest/rib pain," in the analysis of the Paragraph B criteria.  (Doc. No. 9 at 21.)  Munger asserts that, "despite all the evidence and treatment for pain symptoms, the ALJ failed to mention or analyze the role Mr. Munger's pain played in her analysis."  (*Id.*)  Munger maintains that when his pain is considered in combination with his psychological symptoms, "the Listing should be satisfied."  (*Id.* at 22-23.)  In addition, Munger implies the ALJ failed to directly address Listing 12.07.  (*Id.* at 23.)  Munger argues that the "very nature of Listing 12.07 … assesses somatic complaints, but there was no evidence to point to that this was done," and therefore, remand is required.  (*Id.*)

The Commissioner responds that the ALJ "reasonably determined" Munger did not meet the Paragraph B criteria for Listing 12.07, and this finding "was consistent with the regulations."  (Doc. No. 11 at 8.)  The Commissioner argues that the ALJ "reasonably concluded" Munger did not have marked restrictions in the areas of concentrating, persisting, or maintaining pace or adapting or managing himself, the only two domains Munger challenges on judicial review.  (*Id.* at 9.)  The Commissioner asserts that Munger's listing argument "merely lists the facts most favorable to him, incorrectly asserts that the ALJ failed to consider his pain, and asks for a *de novo* review of the evidence in his favor."  (*Id.* at 10.)  In addition, Munger's assertion that the ALJ failed to consider Munger's pain is incorrect when reading the decision as a whole as required.  (*Id.* at 11.)  "In fact, the ALJ discussed Plaintiff's pain throughout the

24

decision, and while acknowledging Plaintiff's pain complaints, reasonably determined that the objective evidence and opinion evidence did not require a finding of a marked or extreme limitation[] in the above discussed mental functional realms." (*Id.*)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 40.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed

Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his or her decision. *Id.* at 416-17.

Listing 12.00, the introductory paragraph to the mental disorder Listings of 20 C.F.R. Pt. 404, Subpt. P, App. 1, states in relevant part:

> 2. Listings 12.07, 12.08, 12.10, 12.11, and 12.13 have two paragraphs, designated A and B; your mental disorder must satisfy the requirements of both paragraphs A and B. Listings 12.02, 12.03, 12.04, 12.06, and 12.15 have three paragraphs, designated A, B, and C; your mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. Listing 12.05 has two paragraphs that are unique to that listing (see 12.00A3); your mental disorder must satisfy the requirements of either paragraph A or paragraph B.
>
> > a. Paragraph A of each listing (except 12.05) includes the medical criteria that must be present in your medical evidence.
> >
> > b. Paragraph B of each listing (except 12.05) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see §§ 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 12.05.)

Listing 12.00 of 20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added). Thus, in order for Munger to meet Listing 12.07, he must meet the criteria of paragraph A[3] and paragraph B of that Listing.

---

[3] As Munger challenges only the ALJ's analysis of 12.07(B), the Court shall not discuss 12.07(A).

At Step Three, the ALJ found as follows:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, 12.07, and 12.11. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

> In understanding, remembering, or applying information, the claimant has a moderate limitation. The claimant reported he received special education services while in school from 1996 to 2009 and alleged difficulty with comprehension and remembering to take medications (Ex. B1E/3, B5E). He completed the 12th grade in August 2009 and has held jobs, most recently performing mail delivery in 2019 and 2020 (Ex. B1E/4, B12E/1, B14F). He is able to perform self-care, handle finances, attend medication appointments, shop in stores and on the computer, and can drive (Ex. B5E, B7F/2). The claimant also provided his medical history, answered questions, and understood and followed treatment plans. On examination, he showed coherent thought process and normal memory (Ex. B3F/6, B5F/17, 24, 32, 41, B8F/9, B11F, B15F/8, B17F/8, 10, 16, 19, 22, B18F/8). Thus, the undersigned finds the claimant has moderate limitation in the ability to learn, recall, and use information.

> In interacting with others, the claimant has a moderate limitation. The claimant alleged difficulty engaging in social activities, being around others, and dealing with authority (Ex. B5E). He reported to get along with family members and spends time with his girlfriend and two daughters (Ex. B5E, B18F/5). He got along with providers during visits and presented as pleasant and cooperative with appropriate eye contact and generally normal speech (Ex. B3F/6, B5F, B18F/8). Therefore, the undersigned finds the claimant has moderate limitation in the ability to interact with others independently, appropriately, effectively, and on a sustained basis.

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant alleged difficulty with following instructions and completing tasks and can pay attention for 20 minutes or so (Ex. B5E/5). He is able to perform personal care, manage funds, read, and use the internet (Ex. B5E). Examinations indicated the claimant was alert and oriented with normal attention and no indication of distractibility (Ex. B2F/38, B3F/1, B5F/8, 24, 32, 41, B7F/2, B14F/5, B15F/2-22, B17F/4, 7, B18F). Accordingly, the undersigned finds the claimant has a moderate limitation in the ability to focus attention and stay on task at a sustained rate.

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant alleged difficulty handling stress and has no routine due to his illness (Ex. B5E). He handles personal care and lives alone (Ex. B5E, B13F/5, B18F/5). He presented as pleasant, friendly, and cooperative with appropriate grooming and hygiene and normal behavior and impulse control (Ex. B2F/38, B3F/6, B5F/8, 17, 24, 32, 41, B8F/9, B11F/9, B17F/16, 19, 22, B18F/8). He noted to have no problems with control of anger or emotions. Therefore, the undersigned find the claimant has a moderate limitation in the ability to regulate emotions, control behavior, and maintain well-being.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 365-66.)

The Court finds substantial evidence supports the ALJ's Step Three findings.  First, Munger's argument is not well-taken, as counsel did not make a listing argument at the administrative level; rather, counsel argued that it was Munger's "combination of impairments that are either going to take him off task, cause absenteeism, or have the limitations you identified, but with occasional handle, finger." (*Id.* at 292.) Second, while the ALJ did not use the word "pain" in the Step Three analysis, the ALJ considered Munger's allegations "due to his illness" (*id.* at 366), and the records the ALJ cited in support of the Step Three findings include Munger's own statements and treatment records regarding Munger's left-sided pain.  (*See, e.g., id.* at 623-24, 720-21, 734-37, 742-45, 751-54, 802-05, 906-09, 955-57, 1025-36.)  Third, Munger fails to challenge the weight assigned to the state agency reviewing psychologists' opinions, who also found Munger did not meet or equal any of the listed impairments.[4]  (*Id.* at 316, 325, 334-35, 347-48.)  Even Munger's own treating physician opined he had no limitation in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (*Id.* at 987-98.)

---

[4] Although the state agency reviewing psychologists considered only Listings 12.04 and 12.06, as set forth above, the Paragraph B criteria for these two listings is identical to Listing 12.07.

However, even assuming the ALJ's Step Three analysis was insufficient, the Sixth Circuit has found that remand is not required where the error is harmless. *See, e.g., Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364-366 (6th Cir. 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th Cir. July 15, 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). *See also Ison*, 2017 WL 4124586, at **5-6; *Cygan v. Comm'r of Soc. Sec.*, Case No. 14-14356, 2016 WL 1128087, at **2-3 (E.D. Mich. March 23, 2016); *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at **5-7 (N.D. Ohio June 18, 2015); *Wilson v. Colvin*, No. 3:13-CV-710-TAV-HBG, 2015 WL 1396736, at **3-4 (E.D. Tenn. March 26, 2015).  Specifically, a court may find an ALJ's failure to adequately discuss whether a claimant meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Forrest*, 591 F. App'x at 366. *See Bledsoe,* 165 F. App'x at 411 (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge*, 572 F. App'x at 417 (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion). *See also Ison*, 2017 WL 4124586, at *5 (stating "this Court may review the entire administrative decision to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion"); *Kerns v. Comm'r of Soc. Sec.*, Case No. 2:16-cv-57, 2017 WL 1324609, at **2-3 (S.D. Ohio April 11, 2017) (finding the ALJ supported its step three determination in her review of the medical evidence, extensive analysis conducted during the RFC assessment, and credibility determination).

The ALJ considered Munger's pain throughout the RFC analysis.  (*Id.* at 367-75.)  After thoroughly discussing the record evidence, the ALJ determined as follows:

> The claimant's allegations of disabling functional limitations are not entirely consistent with the evidence of record. The claimant's impairments

29

could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and impact on functioning are not consistent with the totality of the evidence.

As such, the medical record does not establish functional limitations that would preclude the restrictions stated above. The claimant's conservative course of treatment has involved outpatient visits, referrals, and a medication regimen. Despite allegations of limitations, examinations and tests showed stability and no significant worsening. The claimant maintained intact system functioning as demonstrated during examinations that showed generally regular heart rate and rhythm, clear lungs and pulmonary effort, 5/5 strength, except 4/5 left-sided handgrip, some tenderness but full range of motion, intact sensation and reflexes, intact neurological functioning, and normal coordination and gait with no evidence of a prescribed or medically necessary assistive device. The claimant also showed the ability to interact with cooperative, friendly behavior, normal thought content, full orientation, normal memory and attention, and ability to provide information, answer questions, and understand and follow treatment plans.

The undersigned is cognizant that the degree of limitation that a person might experience from impairments might not necessarily be reflected in a particular treatment note; however, in the instant matter, the longitudinal record does not reflect a significant degree of functional limitation from the claimant's impairments. Treatment notes and examination findings do not support loss of functioning that would support a disabling degree of physical or mental limitation. Thus, the medical evidence does not support a greater degree of limitation than that which is set forth in the above residual functional capacity assessment.

In sum, the claimant's alleged functional limitations are not entirely consistent with the claimant's reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions. Nonetheless, the above evidence supports that the claimant has experienced the degree of limitation reflected in the residual functional capacity assessment above and discussed above. The light exertional level with postural, manipulative, environmental and mental limitations accounts for any deficits in functioning or symptoms from physical and/or mental impairments.

Accordingly, the undersigned finds the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this decision.

(*Id.* at 372-73.)  Therefore, any error at Step Three was harmless.

**B.     RFC Challenge**

**1.     Hand Limitations**

Munger argues that the ALJ erred by not limiting Munger to occasional handling, fingering, and feeling bilaterally.  (Doc. No. 9 at 18.)  Munger recites record evidence that he maintains supports a more restrictive finding than the frequent handling the ALJ included in the RFC.  (*Id.*)  Munger also asserts that the ALJ failed to "even acknowledge any limitations with respect to fingering and feeling," despite the numbness in Munger's fingers "dictat[ing] that there would be limitations" on his ability to manipulate. (*Id.*)  Munger argues that the ALJ could have ordered a consultative examination if the ALJ felt she could not assess these limitations herself.  (*Id.*)  Munger asserts that this error is not harmless, as the VE testified that a limitation to occasional handling, fingering, and feeling bilaterally would be work preclusive.  (*Id.* at 19.)  Therefore, a remand is required.  (*Id.*)

The Commissioner responds that Munger's argument "is nothing more than a request for a *de novo* review of the evidence in his favor."  (Doc. No. 11 at 12.)  In addition, the ALJ "thoroughly explained that the evidence did not support further restrictions."  (*Id.*)  The ALJ limited Munger to frequent handling bilaterally despite the lack of "objective evidence of any right-hand weakness" in the record.  (*Id.*)  In addition, the limitations the ALJ included in the RFC "are *more restrictive* than any medical opinion in the record."  (*Id.*) (emphasis in original).  For all these reasons, substantial evidence supports the ALJ's RFC finding limiting Munger to frequent handling bilaterally.  (*Id.* at 13.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the

relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996). "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249,

32

2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Substantial evidence supports the RFC findings regarding Munger's ability to handle, finger, and feel.  The ALJ discussed the evidence on which Munger relies to support more restrictive hand limitations, including the cervical MRI (which, as noted by Munger's doctor, "would not explain his non-dermatomal pain affecting his whole hand" (Tr. 806)) and left-sided hand weakness.  (*Id.* at 370.)  However, the ALJ also noted findings inconsistent with Munger's claims relating to his hands, including intact sensation, coordination, and reflexes, intact neurological functioning, and normal range of motion.  (*Id.* at 370-73.)  In the subjective symptom analysis, the ALJ concluded:

> The cumulative effects of the pain and residual functioning related to physical impairments support limiting the claimant to less than light exertion with additional limitations on postural, manipulative, environmental, and mental activities. Examinations do not reflect the degree and frequency of pain and other symptoms one would expect based on testimony and allegation of symptoms. Examination findings also do not support loss of strength, range of motion, sensation, reflexes, coordination, or gait that would support a disabling degree of limitation. The medical evidence, even with a consideration of limitations from pain and other symptoms, does not support a greater degree of limitation than that which is set forth in the above residual functional capacity assessment. This finding also reflects the undersigned's consideration of the claimant's obesity to the extent it limits the claimant's functioning, singly, and in combination with the other impairments, pursuant to SSR 19-2p, and the above postural activity restrictions are reasonably consistent with the claimant's obesity.

> Thus, this residual functional capacity finding is supported by, and consistent with, the evidence of record, including the medical evidence, examination findings, and the persuasive portions of the medical opinions of record. This finding reasonably accommodates the limitations the claimant experiences from impairments.

(*Id.* at 373.)

It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Munger would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

### 2.  Time off-task/Absenteeism

Munger argues that the ALJ erred by not failing to include limitations of time off task and/or absenteeism, as the "combination of his pain and his mental health symptoms would affect his ability to concentrate and focus and also interfere with his attendance at work." (Doc. No. 9 at 19.)  Munger recites record evidence that he maintains supports a finding that he would be off task or absent.  (*Id.* at 19-20.) Munger asserts that, given the VE's testimony regarding time off task and absenteeism, the time Munger was off task and the number of days he would be absent "could make the different [sic] of whether Mr. Munger was disabled or not disabled."  (*Id.* at 20.)

The Commissioner responds again that this is a request for a *de novo* review of the evidence in Munger's favor.  (Doc. No. 11 at 13.)  In addition, Munger fails to identify any medical source support for his claims, as no medical source opined that he would be off-task 15% of the time or that he would be absent on a consistent basis.  (*Id.*)  Furthermore, the ALJ considered evidence that showed Munger demonstrated normal attention, showed no sign of distractibility, and had improved pain control with medication.  (*Id.* at 13-14.)  For all these reasons, substantial evidence supports the ALJ's RFC finding and Munger's argument should be rejected.  (*Id.* at 14.)

Substantial evidence supports the ALJ's RFC findings.  The ALJ considered Munger's allegations regarding his pain and its impact on his concentration, memory, and activities of daily living.  (Tr. 368.)

34

However, the ALJ found Munger not as limited as alleged, identifying evidence in the record in support of her findings.  (*Id.* at 368-75.)   It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Munger would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

## C.     Sentence Six Remand

Munger argues that the following records "relate to events that occurred after the hearing but are highly pertinent to Mr. Munger's severe impairments which were in front of the ALJ at the time of the hearing": (1) a June 26, 2023, telephone chronic pain evaluation with Nurse Ferguson; (2) a July 12, 2023, follow up appointment with Dr. Mushkat Conomy; (3) an August 8, 2023, follow up appointment with Dr. Mushkat Conomy; and (4) an August 18, 2023, follow up appointment with Dr. Mushkat Conomy.  (Doc. No. 9 at 23-24.)  Munger asserts that if the ALJ had these records, "it is probable that the ALJ would have made a different decision."  (*Id.* at 23-24.)  Munger maintains that this evidence is new and material, as it post-dated the hearing decision but related to the hand issues before the ALJ during the hearing.  (*Id.* at 24.)

The Commissioner responds that while this evidence may be "new," Munger fails to show this evidence is material as required.  (Doc. No. 11 at 14.)  These records show continued subjective complaints and treatment of Munger's hands.  (*Id.* at 14-15.)  "While this evidence may be new, it merely shows additional complaints and related treatment notes that mirror those considered by the ALJ in the decision, along with a potential, but not confirmed new diagnosis, of carpal tunnel syndrome."  (*Id.* at 15.)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g). *Id. See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148

35

(6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 717 (6th Cir. 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand"). Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626). Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (same). Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing. *See Prater v. Comm'r of Soc. Sec.*, 235 F. Supp. 3d 876, 880 (N.D. Ohio Feb. 14, 2017). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 540 F. App'x 517, 519-20 at *3 (6th Cir. 2013) (same). Similarly, "[t]o be material, the evidence must

36

relate to the time period at issue – i.e., from the alleged onset date through the date of the ALJ's decision." *Malanowksi v. Comm'r of Soc. Sec.*, No. 1:13CV763, 2014 WL 2593960, at *10 (N.D. Ohio June 10, 2014) (citing *Casey v. Sec'y of Helath & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 685 (6th Cir. 1992)).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 479 F. App'x at 725. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 479 F. App'x at 725. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand[s] for further fact-finding." *Courter*, 479 F. App'x at 725. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U.S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

The Court finds Munger has not demonstrated a sentence six remand is appropriate. This evidence is "new," as it post-dates both the administrative hearing and the ALJ decision. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio June 14, 2005). However, Munger must also demonstrate the materiality of this evidence. First, the August 8 and 18, 2023 records post-date the period at issue – August 6, 2020 (the alleged onset date) through August 2, 2023 (the date of decision). These records "pertain to Plaintiff's condition after the date of the ALJ's decision" and do not relate back in time. *Malanowksi*, 2014 WL 2593960, at *10. Therefore, this evidence cannot be material. *Id.* Second, the June 26, 2023 and July 12, 2023 treatment records simply document Munger's complaints about numbness in his arms and legs and that his primary care physician had ordered further work up.  Therefore, Munger fails to show this evidence would have created a "reasonable probability that the ALJ would have rendered a different decision." *Cross*, 373 F. Supp. 2d at 734.  As a result, Munger fails to show the evidence was material as required for a remand under sentence six.

Even assuming the evidence was new and material as required by the first prong of a remand under sentence six, Munger fails to provide any argument to meet his burden of establishing "good cause."

For all the reasons set forth above, the Court finds Munger failed to meet his burden to prove a sentence six remand is warranted.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: March 7, 2025                         *s/ Jonathan Greenberg*
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge